UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                      Plaintiff,                      Case Number 19-20193

v.                                               Honorable David M. Lawson

DAVID ARNOLD,

                      Defendant.

_____/

## OPINION AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Defendant David Arnold was arrested for and charged with possession of a firearm by a felon after the Detroit police found a stolen handgun in the glovebox of the car he was driving. The police stopped the car because the temporary license tag was not legible. The government attempts to justify the warrantless search of the glovebox under the inventory search exception, but the timing of the events does not support that argument, and the police officers' testimony on that score is not credible. Nonetheless, because the car would have been impounded and inventoried regardless of the illegal search, the inevitable discovery rule precludes application of the exclusionary rule to the fruits of the search. Therefore, the Court will deny Arnold's motion to suppress the firearm. Also, because Arnold's incriminating statements were obtained lawfully, the Court will deny the motion to suppress those as well.

## I. Facts

According to the testimony at the evidentiary hearing held on August 7, 2019, Detroit Police Officers Kairy Roberts and Timothy Oravetz were on routine patrol at about 9:15 p.m. on February 6, 2019, traveling on Vernor Highway when they spotted the white Dodge Charger Arnold was driving. The car had no permanent license plate, and the temporary tag on the back of

the vehicle was obscured by road grime. In Michigan, driving a car with an obscured license tag is a civil infraction. Mich. Comp. Laws § 257.225(2), (7). Roberts initiated a traffic stop.

The dash camera and body camera evidence admitted at the hearing show that as Roberts approached the Charger, Arnold was in the driver's seat. Arnold's girlfriend, Simone Bascomb, was in the passenger seat. After Roberts introduced himself, the following exchange took place:

| | |
|---|---|
| Roberts: | Uh . . . we just can't see no temp tag or nothing on your car. . . . |
| Arnold: | Temp tag? |
| Roberts: | It's like scraped off or something, man. |
| Arnold: | The tag? |

Roberts then walked to the back of the car and examined the plate. He returned to the driver's side and told Arnold, "Yeah, I got it. It's just real dark, bro."

While Arnold and Bascomb rummaged through papers in search of the vehicle's registration, Roberts scanned the interior of the vehicle from the outside with the aid of a flashlight. Arnold stated that he had a driver's license and denied having any weapons in the car; he also said he did not hold a concealed pistol license. Arnold then handed Roberts an identification card, which, upon inspection, prompted Roberts to ask Arnold to unlock the car, take his seatbelt off, and place his hands on the steering wheel. Arnold complied, and Roberts assisted him out of the vehicle.

Roberts then placed cuffs on Arnold's wrists, informed him, "I'm going to detain you real quick, alright, bro?" and questioned whether Arnold understood that he cannot drive without a license:

| | |
|---|---|
| Arnold: | I'm not — I got a license. |
| Roberts: | You gave me ID though. |
| Arnold: | Yeah. |
| Roberts: | That's the wrong one. |
| Arnold: | . . . I have a license, though. You can run it. |

While walking Arnold to the patrol car, Roberts asked Arnold whether he is on probation "or anything" and whether he has ever been to jail. Arnold responded to both questions in the negative. Roberts told Arnold that he was not going to make him wait in the cold. Arnold explained to Roberts that he and his girlfriend were on their way to her place of work, as she apparently had been called in to close the shop for the night. Roberts then placed Arnold in the back seat of the patrol car, assuring him, "Let me try to get you all on your way real quick."

Shortly after Roberts took his seat to run Arnold's information through his computer, his partner, Timothy Oravetz, who had been attending to Ms. Bascomb, slid into the patrol car's passenger seat with her identification card and other paperwork. Roberts then volunteered to stand outside with Bascomb while Oravetz ran their information through the system. Bascomb was smoking a cigarette near the hood of the patrol car a few feet behind the stopped vehicle; she informed Roberts that she was going to be late for work. Unprompted, she initiated the following exchange:

Bascomb: This is my car. Everything is registered in my name. Everything is good.
Roberts: (muffled)
Bascomb: No. Everything is — swear to God, we literally were about to close my job, leaving my house, my kids. We good people. Literally.
Roberts: I know.
(short pause)
Roberts: Tags looked a little obscured, that's all, if you can see it.
Bascomb: I know.

Roberts then walked toward the vehicle, pausing at the front passenger side. He once again scanned the interior using his flashlight. Roberts then opened the front passenger door and popped open the glovebox. He retrieved a firearm from the glovebox and proceeded to remove the cartridges. He walked back to where Bascomb was standing and told her, "I'm going to detain you real quick, alright," at which point the camera temporarily blacked out.

When the recording resumed, Bascomb was seated in the backseat of the patrol car and a backup patrol car had arrived on scene; Arnold no longer was seated in the primary patrol car. Roberts obtained a screwdriver from the second patrol car to take the temporary tag off of Arnold's vehicle. He then walked toward the rear of Arnold's vehicle and squatted down near the trunk. At that point, the temporary tag is visible in the recording. The tag was covered in a grimy film. Although the tag was easily readable in the courtroom, Roberts testified that he could not make out the writing when the tag was affixed to the car.

As revealed by the dash camera recording, while detained in the primary patrol car, Arnold admitted to the other officer that he is on parole for an armed robbery conviction from 2010. Shortly thereafter, Bascomb was placed in the backseat next to him in handcuffs.

Arnold:      What's going on?
Bascomb:     They say they found the gun in the car.
Arnold:      Oh no . . . that ain't our gun.

The remainder of their exchange is somewhat unintelligible. It seems that Arnold's cousin Darnell had control of the car at some point, and Arnold believed that the gun was his.

Again unprompted, Bascomb began talking to Officer Oravetz, who was seated in the front seat (not visible):

Bascomb:     Sir, I did not have nothing to do with this . . . Swear to God.
Arnold:      I swear to God that is not her gun . . . sir . . .
Bascomb:     Like, I literally have to close my job now — I don't know nothing
             about nothing. Swear to God.
(short pause)
Bascomb:     I don't even carry my own gun. I got a gun, but I don't even carry
             my own.
Arnold:      (muffled) . . . That's not your gun.
Bascomb:     I know that's not.
Arnold:      (muffled)
(longer pause)
Oravetz:     So where did this come from then?
Arnold:      That's (muffled) . . . Darnell's . . .
(muffled conversation)

-4-

| | |
|---|---|
| Bascomb: | I was --- just woke up to my boss calling me telling I gotta go close. |
| Arnold: | My girl . . . (muffled) . . . close the shop. |
| Bascomb: | I don't know — I don't have a clue about — I swear to God I just woke up my damn self. |
| Oravetz: | I mean, who else — who else drives that car? |
| Arnold: | The million dollar — Darnell. That's my cousin . . . |
| Bascomb: | And he let his cousin drive my car earlier today. |
| Arnold: | I just got it back from him --- |

At some point, Arnold was transferred to the backup patrol car. Before he was transferred, however, the car's camera recorded a conversation between Oravetz and other police officers bringing the others up to speed:

| | |
|---|---|
| Oravetz: | Male is driving. Female in the passenger seat. Male has a suspended license. Take him out. Take her out. It's her car, in her name. Pistol is in the glovebox. In front of her. Stolen — stolen pistol. She says she has a CPL; she doesn't. And at this point, he says his cousin just had the car — brought it back. He says it's his cousin's pistol. I was like, "that's — that's not how it works." She owns the car, so at this point, I'm about to take her for the pistol. It's right in front of her. It's her vehicle. She's responsible for it. And he's going to go for DWLS. |
| Officer 3: | Yeah, and then let detectives — |
| Oravetz: | That's kind of how — that's the most logical way that I have it . . . she's going to get CTW — possession of stolen property, because it's a stolen pistol. He's going to get DWLS . . . |
| Officer 3: | It's probably — it's his, so then he'll probably take the hit — |
| Oravetz: | That's why I just told — I just told Roberts. I was like unless we interrogate them right now and he says it's my pistol, we're taking her on it. |
| Officer 3: | Yeah. Yeah, take them both. We'll convey her for you. |
| Oravetz: | What? |
| Officer 3: | I said we'll convey her for you. Or him. Whatever works. |
| Oravetz: | Cause I mean, unless — unless we get it on paper and he confesses that it's his right now, we can't take him for it. |
| Officer 3: | Exactly. Has he got any warrants or anything? |
| Oravetz: | No. That's why he's going to get — he's going to get DWLS. |
| Officer 3: | F***ing twenty dollar bail — |
| Oravetz: | Unless — the only other thing is, if we take them, take them both, and we interrogate them — both of them — you interrogate one, and I interrogate the other, and we — ah, that doesn't even matter. PDU can do that. PDU can interrogate them and figure out further, I guess. |
| Officer 3: | Yeah. |
| Oravetz: | Cause he — like I said, his story is — we're like "where did this pistol come from, then?" and they're like — he's like, "my cousin just had the car. He just brought it back to us." He's putting it all on his cousin. |
| Officer 3: | (laughing) |

| | |
|---|---|
| Oravetz: | So — alright. |

. . .

| | |
|---|---|
| Officer 3: | Was the stop with the temp tag? |
| Oravetz: | Yeah, because you can't f***ing read it. |
| Officer 3: | I put that on evidence. |
| Oravetz: | The temp tag? |
| Officer 3: | Yeah . . . that way they can't say shit in court. |

(long pause)

| | |
|---|---|
| Officer 3: | Want to separate them now so they don't talk? Which one do you — |
| Oravetz: | (muffled) it don't matter. Whatever you want. |
| Officer 3: | Which one is least likely to (muffled) . . .? |
| Oravetz: | To what? |
| Officer 3: | Which one is least like to say — |
| Oravetz: | He's on parole, so — |

As an officer departed to bring Arnold to the backup car, Roberts can be heard talking to another officer, commenting on how long it took Arnold to pull over and speculating that they were on their way to steal something.

Arnold then was moved to the backseat of the backup car. He sat quietly for several seconds before an exchange with Officer Oravetz began:

| | |
|---|---|
| Oravetz: | So right now, you're under arrest, alright? |
| Arnold: | Oh. Yeah, that's my acknowledgment. |
| Oravetz: | I'm telling you that you are. |
| Arnold: | Oh. Okay. For? |
| Oravetz: | For driving without a license. |
| Arnold: | (muffled) |

An officer then entered the front cabin and sat in the driver's seat. After initially hesitating, Arnold resumed conversation:

| | |
|---|---|
| Arnold: | Hey, excuse me, hey, officer? |
| Officer: | What's up? |
| Arnold: | Can I — can I speak to him outside? |
| Officer: | Who? |
| Arnold: | The — the officer in the other car here in the driver's seat. |
| Officer: | My partner? |
| Arnold: | In the other car? |
| Officer: | Yeah. |
| Arnold: | Yeah. |

| Officer: | What do you need to tell him? |
| Arnold: | I just want to — make sure that my girl is straight. (muffled) |
| Officer: | Yeah, she's good. |
| Arnold: | Alright. She's going home? |
| Officer: | No. |
| Arnold: | What's she been charged with? |
| Officer: | She is going to get charged with the pistol right now. |
| Arnold: | Oh no. Uh uh. I can't — I'll — charge me with the pistol. |
| Officer: | No. We can't do that, bro. |
| Arnold: | Come on. Charge me with the pistol. |
| Officer: | (no response) |
| Arnold: | Come on, bro. That's my gun. (muffled) |
| Officer: | (no response) |
| (long pause) | |
| Arnold: | Hey, officer . . . that's my gun here, officer. (muffled) Don't charge my girl. |
| Officer: | We'll talk about it when we get down there, alright? |

A couple minutes passed before Oravetz opened the backseat door and assisted Arnold out of the car. Oravetz told Arnold that they had to complete some paperwork. The handcuffs then were removed from Arnold's wrists and refastened so that his hands were placed in front of him. Arnold took his seat in the back again as Oravetz walked around the rear of the car and took a seat next to Arnold. At this point, Oravetz gave Arnold his *Miranda* warnings; Arnold read them aloud and initialed the paperwork. He did not pose any questions to the officer before signing the waiver.

As Oravetz continued to fill out the paperwork, Arnold asked if he was under arrest for driving without a license, indicating that he in fact has a license. Oravetz clarified that driving with a suspended license is the same thing as driving without a license, and that it constituted a misdemeanor offense. Arnold denied being under the influence of any substances. He then asked the officer how the waiver worked:

| Arnold: | Alright, so you put on there, like "is that my firearm in the car right and I say yeah, would I — would that still be able to jump in (muffled), huh? |
| Oravetz: | I don't understand the question. |
| Arnold: | No, I'm saying — You all are saying you're charging her with — she's getting charged with a gun charge. Know what I'm saying? I don't want — I don't want her getting charged with a gun charge. I know she didn't have nothing |

to do with it. Honestly. We got two kids at the house.  Her little brother is at the house right now. We just left the kids and everything. My girl — we was just going up to close the shop. My girl — she don't really — she don't be out here in the streets or none of that.

Officer in front seat:   If it's yours not hers, why would she go to jail?

Arnold:         Exactly, that's what I'm saying.

Officer in front seat:  So then tell my partner —

Arnold:         Yeah — I don't want my girl getting charged with no crime. Yeah, that's what I'm saying.  Yeah. I'll take that.

Oravetz:        So, is the pistol that's in the vehicle yours?

Arnold:         Yeah. I mean —personally, it's probably (muffled) my end. I'd rather take it. Let me take it. Give it to me. Give it to me.

Officer in the front seat:        That's not how this works. It's a yes or no question. She's getting charged with it or you're getting charged with it.

Arnold:         Oh no. Charge me with it.

Officer in the front seat:        Is it your gun —

Arnold:         Yeah. Yeah.

Oravetz:        Is the firearm in the vehicle yours? That's what I want to know.

Arnold:         Yeah.

Oravetz:        It's your firearm?

Arnold:         Yeah.

Oravetz allowed Arnold to review his statement before signing the form.  Arnold did so without reservation.  Arnold then was transferred to the primary patrol car, and Bascomb was placed in the backup vehicle.

Roberts testified that he decided to impound the vehicle because it was involved in the crime of being driven by an unlicensed driver.  Department policy calls for conducting an inventory search of a vehicle that is impounded.  Roberts acknowledged that the vehicle would not have been towed if it had been parked properly.  But the car was stopped on East Vernor highway between Concord and Bellevue Streets, where no parking is allowed, according to Roberts.  Oravetz did not state that parking was prohibited at that location.  However, he testified that the car came to a stop more than twelve inches from the curb and was a hazard to traffic.  Roberts acknowledged that he would not have called for a tow truck if there had been a licensed driver at the scene who could have driven the vehicle away.  But neither Arnold nor Bascolm had a valid driver's license.

Oravitz testified that the police did not learn that Bascolm did not have a valid driver's license until he ran a records check on his computer. That did not occur until after Roberts had searched the glovebox and found the handgun.

The vehicle eventually was towed from the scene to the police impound lot. Bascolm was not taken into custody; she was released at the scene.

## II. Motion to Suppress Firearm

Arnold argues that the traffic stop was illegal because the police had no probable cause to believe that any crime or traffic violation occurred. He also contends that the ensuing search of the car was unlawful as well. The government responds that because the license plate was obscured, the officers properly could pull the car over. It justifies the warrantless search of the vehicle by invoking the inventory exception to the warrant requirement. And it also asserts that even if the scope of the search was excessive, the gun would have been discovered inevitably when the car was impounded, since neither of the occupants had a valid driver's license.

No one contests that basic idea that the Fourth Amendment protects "'the people . . . against unreasonable searches and seizures.'" *Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019) (quoting U.S. Const. amend. IV.). Equally well established is the rule that "[a] warrantless search or seizure is *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *King v. United States*, 917 F.3d 409, 422 (6th Cir. 2019) (quotations omitted).

### A. Traffic Stop

When the police stop a motorist, the driver "and all of his passengers, are 'seized' within the meaning of the Fourth Amendment." *United States v. Pacheco*, 841 F.3d 384, 389-90 (6th Cir. 2016) (citing *Brendlin v. California*, 551 U.S. 249, 256-59 (2007)). To justify stopping a car

without a warrant, an officer must show that probable cause existed that the defendant had committed a civil traffic violation or reasonable suspicion that he had committed a crime. *Cruise-Gulyas v. Minard*, 918 F.3d 494, 496 (6th Cir. 2019) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "The subjective intent of the officer making the stop is irrelevant in determining whether the stop violated the defendant's Fourth Amendment rights." *United States v. Collazo*, 818 F.3d 247, 253 (6th Cir. 2016) (citing *Whren*, 517 U.S. at 813).

The police justified stopping Arnold's vehicle because his license tag could not be read, which constitutes a civil infraction. *See* Mich. Comp. Laws § 257.225(2), (7) (stating that a vehicle registration plate "shall be maintained free from foreign materials that obscure or partially obscure the registration information and in a clearly legible condition," and that a violation of that requirement is "a civil infraction"); *People v. Stanley*, No. 319229, 2015 WL 1314665, at *2 (Mich. Ct. App. Mar. 24, 2015) (concluding that visibility requirements apply to temporary license plates). There has been some discussion in the cases at the circuit level about whether probable cause is required to stop a motorist for a civil infraction, or if reasonable suspicion will do. *See United States v. Simpson*, 520 F.3d 531, 538 (6th Cir. 2008) (citing cases and noting that Sixth Circuit "case law on this issue has not been entirely clear, at least with regard to traffic violations"). In its latest published pronouncement on the subject, the court of appeals noted that "[t]his circuit 'has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation.'" *United States v. Collazo*, 818 F.3d 247, 253-54 (6th Cir. 2016) (citing *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)).

The distinction matters little here, though, because the police had probable cause to stop Arnold's car for a civil infraction. "'Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion.'" *Collazo*, 818 F.3d at 254 (quoting *Blair*, 524 F.3d at 748). "It 'does not require an actual finding of a violation, rather, a probability or substantial chance of criminal activity is all that is required.'" *Ibid.* (quoting *United States v. Huff*, 630 F. App'x 471, 495 (6th Cir. 2015)); *see also United States v. Sanford*, 476 F.3d 391, 396 n.2 (6th Cir. 2007) ("The relevant inquiry is whether the police officer possessed probable cause . . . to believe that a traffic violation occurred, not whether a traffic violation in fact occurred.").

Although the license tag offered in evidence at the evidentiary hearing was easily read in the full light of the courtroom, its plastic covering was covered with road grime that likely made it illegible on the street at night. The body camera footage supports the testimony that information on the tag could not be seen, even from a short distance. The police properly stopped Arnold's car for a violation of Michigan Compiled Laws § 257.225(2).

## B. Search

Police officers do not have the authority to search a vehicle based on a traffic stop alone. *Arizona v. Gant*, 556 U.S. 332, 345 (2009) (noting that "[a] rule that gives police the power to conduct such a search whenever an individual is caught committing a traffic offense, when there is no basis for believing evidence of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless individuals"). The so-called automobile exception to the warrant requirement can furnish the authority for such a search, but that exception requires the police to have "probable cause to believe the vehicle contains contraband or evidence of criminal activity." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). The police here had *no* basis to believe that Arnold's car was carrying contraband or evidence of a crime.

The government does not argue that the car search could be justified in this case by the automobile exception. Instead, it relies on the inventory exception to the warrant requirement.

"It is settled law that the police may conduct an inventory search of an automobile that is being impounded without running afoul of the Fourth Amendment." *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012) (citing *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007)). But "'an inventory search may not be undertaken for purposes of investigation, and it must be conducted according to standard police procedures." *Ibid.* (citing *Smith*, 510 at 651). "A general written inventory policy does not grant officers carte blanche when conducting a search; rather, it must be sufficiently tailored to only produce an inventory." *Ibid.* (citing *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007)). "Thus, '[i]n conducting an inventory search, officers do not enjoy their accustomed discretion; they simply follow the applicable policy.'" *Ibid.* (quoting *Tackett*, 486 F.3d at 232).

The Detroit Police Department has a written vehicle impoundment policy, which calls for an inventory search of the impounded vehicle. The policy applies to "[a]bandoned vehicles" and "vehicles involved in accidents or crimes." Gov't's Resp., Ex. E, Det. Police Dep't Manual § 204.4-2 ECF No. 21-3, PageID.95. According to the written policy, an "abandoned vehicle" is one that "has remained on private property without the consent of the owner"; or that has "remained on public property for a period of not less than forty-eight (48) hours"; or that was parked on a state road for eighteen hours or more "with a valid registration plate affixed to the vehicle"; or that was "on a state road or highway without a valid registration plate affixed to the vehicle for any period of time." *Id.* § 204.4-4, PageID.99 (citing Mich. Comp. Laws § 257.252a). The circumstances surrounding impoundment in this case do not fit neatly in any of those definitions. The last section comes the closest, but it cannot fairly be said that the Dodge Charger

was parked on the street without a valid registration plate, when it was Officer Roberts who removed the plate at the scene.

Roberts testified that he decided to have the car towed because it was involved in the crime of driving without a valid driver's license. But the "crimes" identified in the policy as justifying impoundment are listed as "homicide, robbery, sex crimes, and carjacking"; and "violations[s] of the liquor, gambling, vice or controlled substance laws." *Id.* § 204.4-3.4, PageID.97. Driving without a license does not qualify. Moreover, Roberts testified that he would not have impounded a car for that offense if there was someone in the vehicle with a valid driver's license who could drive the car away.

The government contends that because neither Arnold nor Bascolm had driver's licenses, the police validly could impound, and therefore search, the car. But the timing of the search does not line up with the government's position. According to the video footage and the testimony at the hearing, Roberts approached the vehicle to search the interior after he spoke with Bascolm about the obscured plate, but not before it was known to him that she could not drive the vehicle. There is no dispute that the vehicle was registered to Bascolm. The body camera footage does not reveal that Officer Oravetz, who was in the squad car processing Arnold's and Bascolm's information, informed Roberts of her status before Roberts searched the car. And Oravetz testified at the hearing that he did not run Bascolm's information on his computer until *after* Roberts had searched the car and found the firearm.

What's more, the Impound Policy requires that the officer impounding the vehicle must complete a vehicle impound card, which must include "an itemized list detailing the Accessories on [the] Vehicle." *Id.* at § 204.4-2, PageID.95. The list submitted in evidence itemized nothing (a diagonal line was drawn through all the categories), and the section for "personal property" was

-13-

left blank. Roberts testified that no personal property was seized because Bascolm was allowed to remove her items from the vehicle. But that ignores the obvious fact that a firearm was found in the car and seized. As the most relevant item discovered in the "inventory search," one would think that the officer would have listed it as the policy required.

The officers' testimony that they searched the car as part of an impound procedure — that is, that they conducted an inventory search — is not credible. The evidence shows that Officer Roberts searched the glovebox of the car before a decision could have been made that the vehicle had to be impounded. The search was not conducted under the department's policy. Instead, it was a warrantless search that was not justified by any exception to the warrant requirement.

C. Inevitable Discovery

The discovery of evidence during an illegal search does not automatically lead to the suppression of the evidence. *Utah v. Strieff*, --- U.S. ---, ---, 136 S. Ct. 2056, 2061 (2016) (observing that "the significant costs of this [exclusionary] rule have led us to deem it 'applicable only . . . where its deterrence benefits outweigh its substantial social costs'") (quoting *Hudson v. Michigan,* 547 U.S. 586, 591 (2006)). That cost-benefit balance tips against exclusion when "the causal relationship between the unconstitutional act and the discovery of evidence" is attenuated. *Ibid.* One example of when that can occur, relied upon by the government here, is known as the inevitable discovery doctrine, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Ibid.* (citing *Nix v. Williams*, 467 U.S. 431, 443-444 (1984)).

To avail itself of that doctrine, and avoid the preclusive consequences of illegal police conduct, the government must "prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Pritchett*, 749 F.3d 417, 437 (6th Cir. 2014)

(citing *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995). "The doctrine applies where the facts indicate that the officers inevitably would have discovered and seized the tainted evidence by following 'routine procedures.'" *Ibid.* (citing *United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007) (alterations and marks omitted)). "'The exception requires the . . . court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.'" *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001) (citing *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)).

The government has sustained its burden here. It is undisputed that neither Arnold nor Bascolm had a valid driver's license. Therefore, neither of them could have driven the Charger from the scene. Impounding would not necessarily have followed. Under the police department's impound policy, Bascolm could have asked for a private company to tow the car. *See* Det. Police Dep't Manual § 204.4-3 ECF No. 21-3, PageID.95 ("A vehicle owner has the option to use a private tow as long as the vehicle can be towed within a reasonable amount of time and does not cause a hazard to other vehicular traffic."). However, there is no evidence that she ever sought that option. Similarly, the vehicle would not have been considered "abandoned" if it were parked properly on Vernor Highway, a state road, and if it were moved from the location within eighteen hours. Officer Roberts testified that no parking was allowed on Vernor Highway at that location, with only two lanes and no parking lane. That testimony was false. The defendant's post-hearing brief included a photograph (consented to by the government) depicting the relevant part of Vernor Highway showing four lanes of traffic and a sign that allows parking from 3 a.m. to 7 a.m. except during snow emergencies.

But Officer Oravetz testified that the car came to rest more than twelve inches from the curb and was a hazard to traffic. Crediting that testimony, impoundment was the only alternative

the police had for dealing with the automobile that evening, since there is undisputed testimony that patrol officers do not drive citizen's vehicles to move them.

Once the impound decision was made, routine police procedure would have led inevitably to a search of the vehicle so that its contents could be inventoried.  And there is little dispute that the inventory search would have extended to the trunk and glovebox.  Even if Officer Roberts had not searched the glovebox illegally, that compartment eventually would have been opened, searched, and inventoried, and the gun (which was stolen) would have been found.  As a consequence, the firearm will not be suppressed in this case because "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson*, 547 U.S. at 593.

The motion to suppress the firearm must be denied.

### III.  Motion to Suppress Statements

Arnold also asks the Court to suppress the statements he made that evening to the police officers, contending that they were illegally obtained.  As can be seen by the exchange reproduced above, Arnold admitted to possessing the gun found in the glove box of his girlfriend's car so that she would not be charged.  He contends that his confession must be suppressed as a fruit of the unlawful traffic stop and that it was elicited improperly in violation of the Fifth Amendment.  He believes that the dash camera footage shows that the police began asking Arnold questions about the firearm before advising him of his rights, and then giving him *Miranda* warnings midstream to cure any constitutional defects in the interrogation.

The first argument — that the confession is tainted as the fruit of an illegal traffic stop — fails because, as noted above, the police had probable cause to stop the vehicle for a civil traffic infraction.

The first statement Arnold made that could be characterized as incriminating was when he was seated in the pack of a patrol car and asked an officer to speak with Officer Oravetz. It was then that Arnold asked the officer to "[c]harge me with the pistol."

Arnold plainly was in custody at the time. Before the police could question him, they were required to inform him that "he ha[d] a right to remain silent, that any statement he d[id] make may be used as evidence against him, and that he ha[d] a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, voluntary statements unprompted by interrogation are admissible even without *Miranda* warnings. *See Edwards v. Arizona*, 451 U.S. 477, 485-86 (1981); *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016) (citation omitted).

Interrogation occurs only when there is express police questioning or its "functional equivalent," which means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (footnote omitted). That did not happen here. Arnold's plea to be charged with possessing the weapon came after the police officer responded to Arnold's question of what Bascolm was being charged with. When the officer responded that she was to be charged "with the pistol right now," Arnold asked to take the fall for her. That exchange did not amount to police interrogation.

Arnold's statements a few minutes later were made after Officer Oravetz administered *Miranda* warnings. "A suspect may waive his *Miranda* rights only if 'the waiver is made voluntarily, knowingly and intelligently.'" *Hill v. Anderson*, 881 F.3d 483, 502 (6th Cir. 2018) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Arnold does not contest the accuracy of those warnings. Instead, he contends that they were not effective because they came too late —

"midstream" in the interrogation process. He relies on *Missouri v. Seibert*, 542 U.S. 600, 614 (2004), where the Supreme Court "found that suppression of defendant's pre- and post-*Miranda* statements was required where the suspect was Mirandized 'midstream' after the interrogation had already begun." *United States v. Ray*, 803 F.3d 244, 267 (6th Cir. 2015) (citing *Seibert*, 542 U.S. at 614).

*Seibert* and *Oregon v. Elstad*, 470 U.S. 298 (1985), are the Supreme Court cases that establish the boundaries for the propriety of confessions obtained when *Miranda* warnings are not given until the interrogation is underway. In *Elstad*, the police went to Elstad's home to arrest him for a neighborhood burglary. When an officer said that he thought Elstad was involved, Elstad admitted that he was present. The police took Elstad to the police station where he was advised of his rights and made a written confession. Elstad moved to suppress both statements, arguing that his first unwarned statement "let the cat out of the bag" and tainted his subsequent, warned confession. The trial court suppressed the first statement but admitted the second one. The state appellate court reversed and the state's highest court declined review. The Supreme Court reversed, rejecting the notion that an initial, unwarned statement inherently taints a subsequent, warned statement and renders it inadmissible. The Court held that "a suspect who has once responded to unwarned yet uncoerced questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318. The Court explained:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Elstad*, 470 U.S. at 314. The rule established is that although an unwarned, uncoerced statement "must be suppressed," the admissibility of a subsequent statement depends "solely on whether it is knowingly and voluntarily made." *Id.* at 309. But where the initial statement is coerced, "the time that passes between confessions, the change in place of interrogation, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310.

The Court considered the midstream warnings practice with a different twist in *Seibert*. There, the police arrested Seibert as a suspect in a deadly fire at her home. When her son with cerebral palsy died in his sleep, she feared neglect charges so she arranged a fire to conceal the circumstances of his death. She also left an unrelated mentally ill houseguest to die in the fire to avoid the appearance that her son had been left alone. At the police station, the police questioned her for 30 to 40 minutes until she confessed that she intended for the houseguest to die in the fire. After a 20-minute break, an officer gave her *Miranda* warnings, obtained a waiver, questioned her a second time and confronted her with her initial statement until she repeated her previous admissions. Seibert sought to suppress both statements. The interrogating officer admitted that he intentionally engaged in a two-step interrogation technique to withhold *Miranda* warnings, obtain a confession, then give the warnings and obtain the same information. The trial court suppressed the initial statement but admitted the second one. The state appellate court affirmed, but the state supreme court reversed finding that both statements should have been suppressed.

A plurality of the Supreme Court affirmed. The Court focused on whether the *Miranda* warnings "could reasonably be found effective" in advising the suspect that she had a "real choice about giving an admissible statement at that juncture." *Seibert*, 540 U.S. at 612 n.4. The Court discussed five factors relevant for determining the effectiveness of mid-stream *Miranda* warnings:

"the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [statements], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as a continuation of the first." *Id.* at 615.

In a concurring opinion, Justice Kennedy stated that *Elstad* should govern the admissibility of post-warning statements unless a deliberate "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J. concurring). If a deliberate two-step strategy was used, then the post-warning statements must be excluded absent curative measures "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Ibid.*

Arnold's post-*Miranda* statements were not the product of a deliberate "two-step interrogation technique." His first statements were volunteered; there was no "first round" of interrogation. The content of the statements overlapped, but the post-*Miranda* statements were given to a different police officer. Arnold plainly was motivated to make both statements by a desire to take a hit for his girlfriend. But nothing in the sequence of events undermines the reality that Arnold "made a rational and intelligent choice . . . to waive . . . his rights." *Elstad*, 470 U.S. at 314.

Because Arnold's statements were obtained lawfully, they will not be suppressed.

## IV. Conclusion

Although the search of the automobile was illegal, the handgun in the glovebox inevitably would have been found when the car was impounded and a routine inventory search was performed. Arnold's statements were not the product of illegal police conduct and were voluntary.

Accordingly, the defendant's motion to suppress evidence and statements (ECF No. 16) is

**DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   October 15, 2019

| |
|---|
| **PROOF OF SERVICE** |
| The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on October 15, 2019. |
| s/Susan K. Pinkowski<br>SUSAN K. PINKOWSKI |
